IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| SIEMENS MEDICAL SOLUTIONS USA, INC., a Delaware corporation,<br><br>    Plaintiff,<br><br>vs.<br><br>WS ACQUISITION, LLC dba WESTERN SHELTER SYSTEMS, an Oregon limited liability company,<br><br>    Defendant. | Case No. 6:23-cv-01882-MC<br><br>OPINION AND ORDER |

MCSHANE, J.:

Plaintiff Siemens Medical Solutions USA, Inc. ("Siemens") brings this action for breach of contract against Defendant WS Acquisitions, LLC dba Western Shelter Systems ("WSS"). Siemens alleges that WSS breached their subcontractor agreement pursuant to a government contract to produce and package CT scanners for the United States Department of Defense ("DOD"). WSS argues that no such agreement was ever formed, and that the parties expressed an intent not to be bound by the conditions of the agreement until a final contract was negotiated. WSS therefore moves to dismiss for failure to state a claim. Def.'s Mot., ECF No. 19. For the following reasons, Defendant's Motion is DENIED.

**BACKGROUND**

This case arises out of a government contract awarded to Plaintiff Siemens and its potential subcontractor, Defendant WSS. In late 2017, the DOD solicited contract bids through a

1 – OPINION AND ORDER

Request for Offer to supply the government with up to 45 computer tomography scanners ("CT scanners"). These CT scanners were to be mounted in containers that would enable the U.S. Army, Navy, and Air Force to deploy them in a range of settings. Compl. at 2, ECF No. 1. Siemens, which manufacturers the CT scanners, subsequently entered into negotiations with WSS, a company that provides the containers in which the CT scanners were to be packaged. *Id.* at 5. This service to be provided by WSS is known as "integration." *Id.*

On March 1, 2018, the parties entered into Teaming Agreement prior to submitting their bid to the federal government. Siemens would submit the proposal as the Team Leader for the contract and WSS would assist in the preparation of the proposal and commit to exclusively providing its services to Siemens if and when the contract was awarded. The Teaming Agreement specifies that the terms and conditions of any future purchase orders (to be placed by Siemens to WSS) would be subject to the terms and conditions of a future subcontract to be negotiated by the parties. Compl., Ex. 2, at 1 ("Teaming Agreement"). The Teaming Agreement states that a Term Sheet with key terms and conditions of a future contract would be negotiated concurrently with the preparation of the bid proposal. The Teaming Agreement also specifies that "neither party shall have any right to any reimbursement, payment, or compensation of any kind from each other during the period between the effective date of this Teaming Agreement and the execution of [the] Subcontract." *Id.*

The Term Sheet referenced in the Teaming Agreement was executed on March 6, 2018. Compl., Ex. 3, at 1 ("Term Sheet"). It is the primary subject of dispute in this matter. The Term Sheet contains numerous clauses disclaiming legal enforcement of the contract. For example, it states that "[u]ntil any such Subcontract is executed, either party may discontinue discussions or negotiations regarding the Subcontract at any time with no resulting liability." Term Sheet at 3.

2 – OPINION AND ORDER

However, the Term Sheet also includes an exemption to these legal disclaimers. The middle section of the Term Sheet is labeled "binding," and additional clauses in the Term Sheet make reference to these binding provisions. The parties disagree over the scope and effect of these terms labeled as binding.

On March 12, 2018, Siemens submitted the bid to the DOD. In May of 2018 the parties entered into Addendum #1 of the Term Sheet, which increased to the price of integration and confirmed that the unit price would include transportation and insurance to the destination selected by the DOD. Compl., Ex. 4. On April 1, 2019, the DOD issued a negotiation letter to Siemens, requesting a reduction in the pricing requirements, and Siemens made a corresponding request of WSS. Siemens and WSS agreed to a revised worksheet to replace the pricing in Addendum #1.

On May 6, 2019, the DOD's Defense Logistics Agency ("DLA") awarded the contract to Siemens. The contract required that Siemens deliver an integrated shelter to DLA for First Article Testing ("FAT") within 120 days of the government-supplied shelter. A non-integrated shelter was delivered to WSS on May 24, 2019, requiring delivery deadline of September 25, 2019. On June 12, 2019, WSS provided Siemens with a project plan, which estimated that WSS would complete the shelter integration by October 14, 2019. Because this timeline would exceed the September 25, 2019, delivery date required by DLA, Siemens then negotiated with DLA for an extension until November 25, 2019. Compl. at 26.

On June 13, 2019, Siemens issued its first purchase order to WSS for total value of $366,892.37, consistent with the pricing schedules agreed to by the parties. After receiving additional delivery orders from DLA in July, Siemens issued more purchase orders with the same terms and conditions to WSS on August 20 and August 22, 2019, for a total of five units.

3 – OPINION AND ORDER

Throughout the fall, WSS did not meet the delivery deadlines outlined in its proposal, and the parties' negotiations over a subcontract began to break down. Siemens had sent WSS a draft Manufacturing Services Agreement ("MSA") in May of 2019, and the parties exchanged revisions on the proposal over the ensuing month. However, from May until December, the parties negotiated a potential contract but never came to an agreement. *Id.* at 8-9. No Subcontract was ever executed. In March of 2020, Siemens notified that it was terminating WSS for defaulting under the terms of purchase orders. *Id.* at 10.

## STANDARD

To survive a motion to dismiss, a complaint must contain sufficient factual matter that "state[s] a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face when the factual allegations allow the court to infer the defendant's liability based on the alleged conduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). The factual allegations must present more than "the mere possibility of misconduct." *Id.* at 678.

The court must accept the complaint's factual allegations as true and construe those facts in the light most favorable to the non-movant, but the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.*; *Twombly*, 550 U.S. at 555. Once the complaint is stripped of conclusory statements, the judge then applies "judicial experience and common sense" and considers "obvious alternative explanations" to determine if the complaint states a plausible cause of action. *Iqbal*, 556 U.S. at 679, 682 (quoting *Twombly*, 550 U.S. at 567) (internal quotation marks omitted). If the complaint is dismissed, leave to amend should be granted unless the court "determines that the pleading could not possibly be cured by the allegation of other facts." *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995).

DISCUSSION

WSS moves to dismiss Siemen's claims, arguing that no contract ever bound WSS to any obligations. Siemens alleges two distinct theories: that the Term Sheet contract, when read in light of the course of performance, evinces a binding contract; and (2) that there was a binding contract independent of the Term Sheet. For the reasons set forth below, the Court denies Defendant's motion to dismiss.

I. **Teaming Agreement and Term Sheet**

Siemens first claims that the Teaming Agreement and the Term Sheet constitute an enforceable contract. "To state a claim for breach of contract under Oregon law, a plaintiff must allege the existence of a contract, its relevant terms, plaintiff's full performance and lack of breach, and defendant's breach resulting in damage to plaintiff." *Saxco Int'l, LLC v. Wright*, No. 3:17-CV-0849-PK, 2017 WL 6888567, at *2 (D. Or. Oct. 18, 2017) (quoting *Arnett v. Bank of Am., N.A.*, 874 F. Supp. 2d 1021, 1029 (D. Or. 2012)). Similarly, too, under Pennsylvania law: "[A] Plaintiff claiming breach of contract must allege '(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resulting damages.'" *KORE Cap. Corp. v. StoneMor Operating LLC*, 608 F. Supp. 3d 208, 211 (E.D. Pa. 2022) (quoting *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (internal alterations omitted)).[1]

Both Oregon and Pennsylvania apply an objective theory of contacts to assess the existence of a contract. *See State v. Heisser,* 350 Or. 12, 25–26, 249 P.3d 113 (2011). An objective approach is unconcerned with the "parties' undisclosed intents and ideas" but instead

---

[1] As the parties both acknowledge, the relevant contractual arrangements select Pennsylvania law as applying, and Oregon law is substantially similar with respect to the relevant questions. Therefore, the Court need not undertake a choice-of-law analysis at this point in the matter.

5 – OPINION AND ORDER

"gives heed only to their communications and overt acts.'" *Heisser,* 350 Or. at 25 (quoting *Kitzke v. Turnidge*, 209 Or. 563, 573, 307 P.2d 522 (1957)). Courts in Oregon and Pennsylvania recognize these agreements not to be bound, which are provisions in agreements that expressly disclaim enforceability. *Logan v. D.W. Sivers Co.*, 343 Or. 339 (2007); *see Philmar Mid-Atl., Inc. v. York St. Assocs. II*, 389 Pa. Super. 297, 301, 566 A.2d 1253 (1989) (applying Pennsylvania law).

WSS argues that the parties expressed their intent not to be bound by the Teaming Agreement and Term Sheet, explicitly disclaiming any liability. Instead, WSS contends, the binding element of the contract was for the parties to *negotiate* in good faith over a future subcontract, which would include the terms designated as "binding" within the Term Sheet. To this point, the parties specified in the Teaming Agreement that "neither party shall have any right to any reimbursement, payment, or compensation of any kind from each other during the period between the effective date of this Teaming Agreement and the execution of [the] Subcontract." Teaming Agreement at 1. The Term Sheet includes similar language. It begins by stating that the purpose of this document is to provide certainty to the government for the purpose so the bid and to set some conditions for future negotiation of the subcontract. Term Sheet at 1 ("The intent of this terms sheet … is to describe, for subcontract negotiation purposes, certain terms of an agreement…"). Later, the Term Sheet states, "[u]ntil any such Subcontract is executed, either party may discontinue discussions or negotiations regarding the Subcontract at any time with no resulting liability." Term Sheet at 3.

In addition to relying on this language disclaiming liability, the agreements include clauses that appear to suggest that it is meant to bind the parties to future negotiations, not immediate terms. The Term Sheet states,

6 – OPINION AND ORDER

> [F]ollowing the award of a purchase order to Siemens … the parties hereby agree to negotiate in good faith and execute a formal agreement for a fixed price subcontract ("Subcontract") containing all final and binding commitment, terms and conditions regarding the Project.

Term Sheet at 1. Supporting this interpretation of a future contract, the fourth paragraph states that the deliverables supplied by WSS "shall ultimately be governed by the terms and conditions of the Subcontract to be negotiated and executed following a contract award by DLA to Siemens." Term Sheet at 3. Continuing, in the section that is designated as "binding," the first sentence states, "Siemens and Integrator *will* agree on certain Subcontract terms as follows." Term Sheet at 2 (emphasis added). Here, the use of the term "will" suggests a prospective interpretation of the contract.

Yet these provisions are contradicted by language elsewhere in the Term Sheet, rendering the agreement ambiguous and at least plausibly intended to bind the parties to immediate obligations. Indeed, for all the provisions in the contract that disclaim liability, there are also many exceptions, expressly labeled, that suggest immediate enforceability. In the third paragraph of the Term Sheet, after stating that it is "non-binding on either party," the Term Sheet states, "except for the section below which is designated as binding." Term Sheet at 1. This clause is referencing the section labeled as "binding," which comprises the entirety of the second page. These binding designations include terms outlining the pricing and payment obligations, the technical specifications of the services that WWS would provide, and the details defining delivery requirements and testing. Term Sheet at 2.

Prior to the binding section, there is another clause that suggests that the contract is binding—or at least makes this question ambiguous. The first page, under the section explaining the purpose of the Term Sheet and the relationship of the parties, begins by stating that the

deliverables for the project (the bid) shall ultimately be governed by the terms and conditions of the Subcontract that the parties will negotiate. However, it goes on to say,

> to assist Siemens in submitting an offer within the competitive range for the RFO, the parties agree that the key Deliverables, pricing, timelines and other key terms of the Subcontract should be finalized *now* to facilitate a const-competitive, responsive offer to DLA.

Term Sheet at 1 (emphasis added). As this language demonstrates, it is at least unclear as to whether this provision was currently binding in the contract. While preceding clauses indicate that the contract was meant to be finalized in the future Subcontract, this subsequent language quite expressly states that certain terms—and not irrelevant ones—are binding "now." *Id.* Furthermore, language near the end of the term sheet that states, "[e]xcept for the designated paragraphs above, this Term Sheet is non-binding on either party," again implying that certain elements of the contract are indeed binding. Term Sheet at 2.

A similar set of facts arose in *Logan v. D.W. Sivers Co.*, where the Oregon Supreme Court found that a contract expressing an intent not to be bound nonetheless contained binding terms. 343 Or. 339 (2007). The contract, though it included language disclaiming liability, also contained the following clause:

> [I]n consideration of Purchaser's good faith efforts to review the due diligence material provided by Seller, Seller agrees to be bound to provide the required due diligence documents to Purchaser within the time required and to comply with the Non–Solicitation provision set forth above.

*Id.* The court concluded that the contract bound the parties to the express provisions above. Here, as in *Logan*, there is express language not to be bound. At the same time there is express binding language, which caused the court in *Logan* to enforce parts of the contracts. That is, despite multiple clauses expressing an intent to be bound, there are also numerous caveats to this disclaimers, and some express language saying that the contract is binding "now." While the

binding provisions here are less explicit than the *Logan* language, it nonetheless suggests that clauses with an express an intent not to be bound will not necessarily supersede contradictory clauses in the same contract.

Where a contract is ambiguous, Pennsylvania and Oregon courts can look to course-of-performance evidence to assist with interpretation. *J.W.S. Delavau, Inc. v. E. Am. Transp. & Warehousing, Inc.*, 2002 PA Super 336, ¶ 30, 810 A.2d 672 (2002); *see Yogman v. Parrott*, 325 Or. 358, 361, 937 P.2d 1019 (1997). Here, though the evidence does not dispositively show WSS' intent to be bound by a contract, it remains an open question of fact. On May 6, 2019, DLA selected Siemens as its CT vendor and issued a delivery order Siemens. The shelter to be used for the FAT was delivered to WSS on May 24, 2019, resulting in a delivery deadline of September 25, 2019. Then on June 12, 2019, WSS provided Siemens with a project plan timeline, which estimated that it would not complete its work for the shelter to be submitted for FAT until October 14, 2019. In response to this proposed timeline, which would not meet the September 25, 2019, deadline required by DLA, Siemens states that it negotiated with DLA for schedule extension to November 25, 2019. Next, on June 13, the day after WSS provided a project timeline to Siemens, Siemens issued a purchase order to WSS with a total order value of $366,892.37, consistent with the pricing agreed upon in the Term Sheet and the subsequent addendum.

After receiving additional order forms from DLA on July 15, August 1, and August 12, 2019, for a total of six units, inclusive of the First Article, Siemens issued addition purchase order to WSS on August 20 and August 22, 2019. These purchase orders were all subject to the same terms and conditions listed above. As Siemens argues, WSS repeatedly failed to meet scheduled delivery deadlines, requiring Siemens to negotiates additional extensions. Siemens

also claims that WSS delays required Siemens to provide DLA with concessions values at $344,410. During this period, the parties continued to negotiate for a final Subcontract. While these activities do not convincingly demonstrate a binding contract, they invite further questions of fact as to whether WSS' course-of-performance conduct evinced an intent to be bound.

Taken together, such conduct by WSS invites further fact questions as to whether it evinced an intent to be bound, when read together with the ambiguous terms of the Term Sheet. WSS' motion to dismiss on the grounds that the contract in dispute was not binding as a matter of law is denied.

## II.  Unilateral Contract

The Court finds Siemens alternative claim unavailing—that the purchase orders represented separate contracts in and of themselves. Siemens contends that these purchase orders had their own contract language, to which WSS agreed to be bound. Yet in such a case of a unilateral contract, the offeree (WSS in this case) is not bound to perform. Indeed under a unilateral contract theory, the offeror invites the offeree to accept the contract through performance. *See Moro v. State*, 357 Or. 167 (2015). But critically, the contract is formed "only after the accepting party has completed the performance sought by the offering party." *Id.* at 224. *See also First Home Sav. Bank, FSB v. Nernberg*, 436 Pa. Super. 377 (1994) ("[A] unilateral contract is not formed and is, thus, unenforceable until such time as the offeree completes performance."). Here, however, WSS did not complete the contract, and Siemens does not appear to allege that it did. As a result, Siemens' theory of unilateral contact fails as a matter of law.

10 – OPINION AND ORDER

## CONCLUSION

Defendant's Motion to Dismiss (ECF No. 19) is DENIED.

IT IS SO ORDERED.

Dated this 3rd day of July, 2024.

                                                  _____/s/ Michael McShane_____
                                                          Michael McShane
                                          United States District Judge