Damon C. Elder, OSB No. 085313
Email: damon.elder@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
1301 Second Avenue, Suite 3000
Seattle, WA 98101-3808
(206) 274-6400 | Phone

Troy S. Brown (*Admitted Pro Hac Vice*)
Email: troy.brown@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
2222 Market Street
Philadelphia, PA 19103-3007
(215) 963-5214 | Phone

Scott L. Mullins, OSB No. 142504
**Mullins Law Office, LLC**
1000 SW Broadway St., Suite 2300
Portland, Oregon 97205
(971) 383-1315 | Phone
scott@slmullins.com

*Attorneys for Defendant WS Acquisition, LLC*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| SIEMENS MEDICAL SOLUTIONS USA, INC., a Delaware corporation,<br><br>             Plaintiff,<br><br>      v.<br><br>WS ACQUISITION, LLC dba WESTERN SHELTERS SYSTEMS an Oregon limited liability company,<br><br>             Defendant. | Case No. 6:23-cv-01882<br><br>**DEFENDANT'S ANSWER AND COUNTERCLAIMS TO PLAINTIFF'S COMPLAINT** |

Defendant WS Acquisition, LLC dba Western Shelters Systems ("WSS" or "Defendant"), by and through its undersigned counsel, hereby responds and asserts affirmative defenses to the claims and allegations asserted in Plaintiff's Complaint, as well as counterclaims, as follows:

## INTRODUCTION

1. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained Paragraph 1.

2. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained Paragraph 2.

3. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained Paragraph 3.

4. Defendant denies the allegations contained in Paragraph 4 of Plaintiff's Complaint.

5. Defendant denies the allegations contained in Paragraph 5 of Plaintiff's Complaint.

6. Defendant denies the allegations contained in Paragraph 6 of Plaintiff's Complaint.

7. Defendant denies the allegations contained in Paragraph 7 of Plaintiff's Complaint.

8. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained Paragraph 8 regarding DLA's orders and Siemens Medical Solutions USA, Inc.'s ("Siemens") deliveries. Defendant denies that it had any

contractual obligation, or any other obligation of any kind, to provide integration services for integrated shelters.

9. Defendant denies the allegations contained in Paragraph 9 of Plaintiff's Complaint.

10. Defendant denies the factual allegations contained in Paragraph 10 of Plaintiff's Complaint. Defendant further denies that Plaintiff is entitled to any relief whatsoever.

## THE PARTIES

11. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 11.

12. Defendant admits the allegations in Paragraph 12 of Plaintiff's Complaint.

## JURISDICTION AND VENUE

13. Defendant admits that its principal place of business in Oregon. The remainder of Paragraph 13 is limited to legal conclusions to which no response is required.

14. Defendant admits that its principal place of business in Eugene, Oregon. The remainder of Paragraph 14 is limited to legal conclusions to which no response is required.

## FACTS[1]

15. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 15.

16. Defendant admits the allegations in Paragraph 16 of Plaintiff's Complaint.

---

[1] Defendant does not repeat each of the headers in Plaintiff's Complaint herein. For the avoidance of doubt, to the extent any such header contains substantive allegations, those allegations are denied.

DEFENDANT'S ANSWER AND COUNTERCLAIMS TO PLAINTIFF'S COMPLAINT - 3

17. Defendant admits that on February 12, 2018, it signed the "Contractor Teaming Arrangement (CTA)" (the "Teaming Agreement") attached to Plaintiff's Complaint as Exhibit 2, which contemplated the negotiation of a subcontract, but which did not impose any binding performance obligations on WSS nor permit Plaintiff to issue binding purchase orders. The terms of the Teaming Agreement speak for themselves. To the extent Paragraph 17 is inconsistent with the foregoing or with the express terms of the Teaming Agreement, WSS denies the allegations in Paragraph 17 of Plaintiff's Complaint.

18. Defendant admits that on March 6, 2018, it signed the "Confidential Summary Of Terms For Proposed Integrator Services For DLA Deployable CT Project" (the "Term Sheet"), attached to Plaintiff's Complaint as Exhibit 3. The terms of the Term Sheet speak for themselves. Defendant denies the remainder of Paragraph 18 of Plaintiff's Complaint.

19. Defendant admits that on May 24, 2018, it signed Addendum #1 to the Term Sheet. The terms of the Addendum speak for themselves. To the extent inconsistent with the terms of the Addendum, Defendant denies the remainder of Paragraph 19 of Plaintiff's Complaint.

20. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 20 and therefore denies the same.

21. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 21 regarding DLA's discussions with Siemens. Defendant further responds that the terms of Exhibit 5 speak for themselves. Defendant denies the remaining allegations in Paragraph 21, and specifically denies any allegation that Exhibit 5 was intended to be binding.

22.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 22 regarding DLA's discussions with Siemens.  Defendant denies the remaining allegations in Paragraph 22, as the delivery of a shelter to WSS did not result in any binding delivery deadline on the part of WSS.

23.     Defendant admits that Plaintiff sent a document purporting to be a purchase order on June 13, 2019, attached to Plaintiff's Complaint as Exhibit 6.  The document speaks for itself.  Defendant denies the remaining allegation contained in Paragraph 23, and specifically denies that the alleged purchase order was binding in any way.

24.     Defendant denies that WSS was ever a party to any purchase order issued by Siemens, or that any such purchase order was binding, and therefore denies the allegations in Paragraph 24 of Plaintiff's Complaint.

25.     Defendant denies the allegations contained in Paragraph 25 of Plaintiff's Complaint.

26.     Defendant admits that it sent a "120 day project plan spanning 6/17 to 10/14" to Siemens on June 12, 2019.  Defendant otherwise denies the allegations contained in Paragraph 26 of Plaintiff's Complaint.

27.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 27 regarding DLA's discussions with Siemens.  WSS admits that Siemens sent documents purporting to be purchase orders, but denies that they were binding on WSS in any way.

28.     Defendant denies the allegations contained in Paragraph 28 of Plaintiff's Complaint.

29. Defendant denies the allegations contained in Paragraph 29 of Plaintiff's Complaint.

30. Defendant admits the parties engaged in negotiations over a subcontract, but otherwise denies the allegations contained in Paragraph 30 of Plaintiff's Complaint.

31. Defendant admits that Plaintiff sent a draft Manufacturing Services Agreement, which did not in-and-of-itself address all of the terms of a future Subcontract, on May 17, 2019. Defendant further admits that the parties negotiated over the following months, which included proposing revisions and additions to the agreement.

32. Defendant admits the there was a meeting between representatives of WSS and Siemens on October 16, 2019. Defendant otherwise denies the allegations contained in Paragraph 32 of Plaintiff's Complaint.

33. Defendant admits the there was a meeting between representatives of WSS and Siemens on October 16, 2019. Defendant further admits that as of December 2019, Siemens agreed to manage the Artemis relationship and assume 100% of the risk associated with that vendor. Defendant otherwise denies the allegations contained in Paragraph 33 of Plaintiff's Complaint.

34. Defendant denies the allegations contained in Paragraph 34 of Plaintiff's Complaint.

35. Defendant denies the allegations contained in Paragraph 35 of Plaintiff's Complaint.

36. Defendant denies the allegations contained in Paragraph 36 of Plaintiff's Complaint.

37. Defendant denies the allegations contained in Paragraph 37 of Plaintiff's Complaint.

38. Defendant denies the allegations contained in Paragraph 38 of Plaintiff's Complaint.

39. Defendant denies the allegations contained in Paragraph 39 of Plaintiff's Complaint.

40. Defendant admits that on March 2, 2020, WSS received a letter from Siemens described by Plaintiff as a "termination letter." Defendant denies that it had defaulted under the terms of any purchase order, and further denies that any purchase order sent by Siemens had any force or effect.

41. Defendant admits that Siemens declined to compensate WSS for costs that it incurred, even though those uncompensated costs arose from Siemens' bad faith approach to the parties' negotiations. Defendant otherwise denies the allegations contained in Paragraph 41 of Plaintiff's Complaint.

42. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 42 of Plaintiff's Complaint.

43. Defendant denies the allegations contained in Paragraph 43 of Plaintiff's Complaint.

44. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 44 of Plaintiff's Complaint.

45. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 45 of Plaintiff's Complaint.

46. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 46 of Plaintiff's Complaint.

47. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 47 of Plaintiff's Complaint.

48. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 48 of Plaintiff's Complaint.

49. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 49 of Plaintiff's Complaint.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
(Default and Breach of Contract)

50. Defendant repeats and incorporates by reference its prior answers as if fully set forth herein.

51. Defendant denies the allegations contained in Paragraph 51 of Plaintiff's Complaint.

52. Defendant denies the allegations contained in Paragraph 52 of Plaintiff's Complaint.

53. Defendant denies the allegations contained in Paragraph 53 of Plaintiff's Complaint.

54. Defendant denies the allegations contained in Paragraph 54 of Plaintiff's Complaint.

55. Defendant denies the allegations contained in Paragraph 55 of Plaintiff's Complaint.

## JURY DEMAND

56. The allegations in Paragraph 56 of Plaintiff's Complaint are legal conclusions to which no response is required. Defendant reserves all rights regarding the propriety of a jury trial on any issues submitted to a finder of fact in this matter.

## PLAINTIFF'S PRAYER

Defendant denies that Plaintiff is entitled to any relief whatsoever, and respectfully requests this Court dismiss all of Plaintiff's causes of action and damages sought.

## GENERAL DENIAL

Defendant hereby denies all allegations not already admitted, denied, or qualified above.

## AFFIRMATIVE DEFENSES

Defendant hereby asserts the following defenses to the Complaint and to the purported cause of action contained therein. By asserting the defenses set forth below, Defendant does not allege or admit that it has the burden of proof and/or the burden of persuasion with respect to any of these matters. Defendant asserts as follows:

1. Plaintiff's allegations against Defendant fail to state a claim upon which relief may be granted.

2. Plaintiff has suffered no damage as a result of any acts or omissions by Defendant.

3. Plaintiff has failed to mitigate its damages, if any.

4. Plaintiff's claims are barred, in whole or in part, by the doctrines of waiver and/or acquiescence.

5. Plaintiff's claims are barred, in whole or in part, by the doctrine of estoppel.

6. Plaintiff's claims are barred, in whole or in part, by Plaintiff's failure to provide WSS with adequate notice of an alleged breach.

7.  Plaintiff committed acts constituting prior material breaches of any alleged agreements, which preclude Plaintiff from recovery.

8.  Plaintiff's claims are barred, in whole or in part, because Plaintiff prevented Defendant's performance.

9.  Plaintiff's claims are barred, in whole or in part, by the doctrine of anticipatory repudiation.

10. Plaintiff's claims are barred, in whole or in part, by the statute of limitations.

11. Plaintiff's claims are barred, in whole or in part, by the doctrine of laches.

12. Plaintiff's claims are barred, in whole or in part, because of Plaintiff's fraudulent inducement.

13. Plaintiff's claims are barred, in whole or in part, by the doctrine of unconscionability.

14. Plaintiff's claims are barred, in whole or in part, by the doctrines of impossibility, impracticability, and/or frustration of purpose.

15. Plaintiff's claims are barred, in whole or in part, by a failure or absence of consideration.

16. Plaintiff's claims are barred, in whole or in part, due to the lack of occurrence of conditions precedent.

17. Plaintiff's claims are barred, in whole or in part, by the doctrines of mutual mistake and/or unilateral mistake.

18. Plaintiff's unclean hands, bad faith conduct, unfair trade practices, and/or fraudulent and unethical behavior preclude Plaintiff's claims and requested relief in this case.

19. Plaintiff's claims, if any, are subject to set-off or recoupment on account of monies owed to Defendant by Plaintiff. Defendant is entitled to amounts owed under the parties' agreements as set forth below in Defendant's counterclaims. Defendant requests for an accounting may also result in this Court determining that further amounts are owing to Defendant.

20. Plaintiff's claims are barred by applicable state or federal law, including but not limited to the Federal Acquisition Regulations and Defense Federal Acquisition Regulation Supplement.

21. Defendant reserves the right to assert additional defenses as discovery progresses.

## DEFENDANT'S COUNTERCLAIMS

### PARTIES

22. WSS is a privately held Oregon limited liability company with its headquarters in Lane County, Oregon.

23. On information and belief, and as alleged by Plaintiff in Paragraph 11 of the Complaint, Siemens is a privately held Delaware corporation with headquarters in Chester County, Pennsylvania.

### JURISDICTION

24. On information and belief, and as alleged by Plaintiff at Paragraph 13 of the Complaint, this Court has subject matter jurisdiction pursuant to 28 U.S.C § 1332 based on the diversity of the parties. This Court also has ancillary or supplemental jurisdiction, under 28 U.S.C. § 1367 or otherwise, with respect to Defendant's counterclaims in this action.

## DEFENDANT'S FACTUAL ALLEGATIONS

Defendant alleges the following additional facts pertinent to its counterclaims against Plaintiff:

25. On March 6, 2018, the parties agreed to the CONFIDENTIAL SUMMARY OF TERMS FOR PROPOSED INTEGRATOR SERVICES FOR DLA DEPLOYABLE CT PROJECT" (the "Term Sheet").  The parties envisioned that the Term Sheet would form the basis for negotiations for a future Subcontract, if Siemens was awarded a contract to provide integrated shelters to the United Stated Department of Defense ("DoD").  The parties understood and agreed that the Term Sheet was not binding on any party and could be terminated at any time without liability.  Nevertheless, if the Court holds that the Term Sheet was a binding contract, then at most, it imposed a duty to negotiate in good faith regarding a potential future Subcontract.  Further, WSS reasonably understood and expected that Siemens would negotiate in a manner consistent with the duty of good faith and fair dealing inherent in every contract.

26. Siemens was awarded the contemplated DoD contract more than a year after the Term Sheet was signed by the parties.  Pursuant to the terms of the Term Sheet, the parties then began negotiations to enter into a definitive Subcontract that ultimately would govern the parties' performance.  Unfortunately, however, Siemens did not conduct those negotiations in good faith.

27. After Siemens was awarded the contract by DoD, it began making material changes to the scope of work to complete the First Article Testing ("FAT") unit.  As a result of these changes, the work to be performed by WSS under any future Subcontract would have been much different than what was anticipated when the parties executed the Term Sheet, resulting in far higher costs to WSS.  Making matters worse, Siemens' changes fluctuated over time, such that it was repeatedly necessary for WSS to reassess the specifications and costs that would apply under

any future Subcontract. This process imposed substantial unanticipated costs on WSS. Further, Siemens demanded that these changes be made on artificially tight and unrealistic timelines, and Siemens failed to provide sufficient clarity regarding the changes for it to be possible for WSS to accommodate the changes within Siemens' proposed timeframes.

28. As a result of Siemens' conduct, WSS became concerned about costs and the feasibility of Siemens' timelines. WSS repeatedly communicated those concerns to Siemens, but Siemens was unresponsive.

29. For example, on July 12, 2019, WSS informed Siemens that, "with everything that has occurred to date with respect to scope changes, concessions being offered that impact our business and not being consulted and agreed to previously[,] a detailed purchase order with clear guidelines as to submission of change requests, costs, and allowable time to respond has to be agreed to, [and] in addition []an agreement between the companies will be needed." Siemens did not address WSS's concerns in good faith.

30. During the same time period, Siemens sent multiple purchase orders to WSS that Siemens knew provided impossible deadlines, and that Siemens also knew were inconsistent with the true scope of work. Upon information and belief, Siemens was aware that WSS did not accept the purchase orders, that the purchase orders were impossible to perform, and that the purchase orders did not govern the parties' obligations. Nevertheless, upon information and belief, Siemens sent the purchase orders in order to create the false impression that the parties' relationship would be governed by the stock, unilateral terms and conditions referenced therein, which were designed to favor Siemens, and which were inconsistent with the Term Sheet.

31. WSS continued to raise concerns about Siemens' changes to the scope of work throughout the fall of 2019. For example, on September 10, 2019, WSS informed Siemens that

WSS was forced to re-evaluate the project plan and timetable because of the changes made by Siemens. WSS explained to Siemens that "[w]e've been working hard to be the perfect partner on this project with you. The fact that no contingency was allowed in the plan, as well as the artificially tight timeline, have played into our current situation where we are engineering without complete information[.]" Once again, Siemens continued to fail to address WSS's concerns in good faith.

32.     As the changes from Siemens mounted, WSS itself acted in good faith and invested substantial resources to try to determine whether and how it could accommodate all of Siemens' modifications into the design of an integrated unit. WSS spent hundreds of thousands of dollars on trying to find ways to accomplish Siemens' design changes on a reasonable timeline, in order to negotiate final terms for a Subcontract. Siemens was well-aware that WSS was making these investments. Eventually, however, it became clear that it would be impracticable to keep accommodating more changes to the project, with no end in sight. As a result, WSS insisted that a definitive Subcontract would need to be negotiated before WSS continued investing more resources. Otherwise, WSS would not have sufficient certainty and clarity regarding the scope of work, and its ongoing investments in meeting Siemens' design changes would be wasted.

33.     On November 27, 2019, WSS emailed Siemens and explained that WSS would like to execute an Engineering Services Agreement ("ESA") and Manufacturing Services Agreement ("MSA") by December 13, 2019. Both agreements were already contemplated by the parties as part of the definitive Subcontract. WSS also indicated that it may freeze all work after December 13, 2019, if no deal was agreed upon by then. On December 2, WSS wrote again and explained that it was "concerned now that we're performing work at our expense with delays caused due to changes made to the scope." And on December 3, WSS explained that Siemens was making

demands that were "outside of commercial and government [contractual] norms. . . ." For example, WSS point out that Siemens had cited a Federal Acquisition Regulation in a draft contract document, but that Siemens had removed a reference to the government from that provision and attempted to "put Siemens in [the government's] place."

34. Siemens once again failed to address WSS's concerns in good faith, and further failed to work in good faith to negotiate a final ESA or MSA with WSS, either before or after December 13, 2019. Nevertheless, Siemens assured WSS that it *was* continuing to negotiate in good faith. For example, Siemens wrote to WSS on December 3, 2019, stating: "We are confident that we can come to a resolution and address your concerns with language in the agreement(s)." WSS relied on Siemens' assurances in continuing to try to negotiate a final agreement.

35. Siemens also insisted on working with Artemis Shielding ("Artemis") as a supplier for shielding materials included in Siemens' proposal to DLA. Artemis's performance on the project was substandard, which added to the already mounting delays and unnecessary expenses created by Siemens' constantly changing demands.

36. WSS timely communicated its concerns about Artemis's performance to Siemens. For example, on December 3, 2019, WSS informed Siemens that WSS had received shielding manufactured by Artemis to be used on a FAT unit, on which Artemis had incorrectly applied the requisite adhesive, and that this was a "serious problem." WSS informed Siemens that the problems with Artemis's performance would further complicate any production timeline. In response to the various concerns raised by WSS, Siemens agreed that it would assume 100% of the risk associated with Artemis's performance. Nevertheless, Siemens later refused to negotiate in good faith regarding the terms of a Subcontract that would be consistent with this agreement.

37. On December 6, 2019, counsel for WSS sent Siemens a revised ESA and MSA that reflected the ongoing changes to the scope and cost of the work demanded by Siemens. On December 14, 2019, Siemens emailed WSS's counsel a series of questions Siemens wanted answered, so that Siemens' representatives could "present the numbers to the Siemens executives early next week for their approval." Siemens concluded the email by informing WSS that "[w]e still value the partnership we have developed with Western Shelter, and our attempt to negotiate shouldn't be interpreted as any repudiation of that partnership. . . ."

38. On December 18, 2019, Siemens wrote to WSS's counsel that "[w]e are preparing to brief the CEO and CFO tomorrow to get the approvals we need to move forward on the ESA and MSA." In reliance on these types of assurances, WSS believed in good faith that the parties' negotiations were ongoing. WSS also temporarily paused its own work pending the finalization of those negotiations, in good faith, consistent with its prior communications with Siemens.

39. On January 9, 2020, WSS's counsel reiterated that WSS had only temporarily stopped work, beginning on December 18, "pending the outcome of your approval process and the meeting with your CEO and CFO[.]" WSS also inquired regarding the status of the ESA and MSA, still believing in good faith that the parties' negotiations were ongoing and that the parties were simply waiting for Siemens' representatives to obtain final approvals internally from Siemens' CEO and CFO.

40. On January 22, 2020, Siemens responded to WSS's counsel's January 9, 2020, email and informed WSS that "we are still struggling to get the approvals we need with the current numbers." Following this email, WSS continued to believe in good faith that negotiations were ongoing.

41.     Upon information and belief, while WSS continued to wait for a response from Siemens, Siemens had already decided to breach the parties' agreement and seek a replacement for WSS in an attempt to cut corners and costs.

42.     Over a month went by until WSS eventually heard back from Siemens. On February 28, 2020, Siemens sent WSS a letter stating that Siemens was terminating the teaming arrangement. Siemens' decision to terminate the arrangement did not arise from any failure or breach by WSS. Instead, Siemens' decision to terminate the teaming arrangement resulted from Siemens' own attempt to evade the spirit of the teaming arrangement, as well as Siemens' lack of diligence and lack of good faith effort to finalize the scope of work for a definitive Subcontract. Indeed, upon information and belief, Siemens entered into a new agreement with a replacement for WSS, *before* Siemens terminated the teaming arrangement and during the time when Siemens was falsely representing to WSS that negotiations were ongoing and that Siemens was simply working on obtaining internal approvals for a final agreement. In sum, Siemens' termination of the teaming arrangement was performed in bad faith.

43.     Siemens' termination of the teaming arrangement, as well as its prior breaches and bad faith conduct, caused WSS to expend considerable amounts of time and money as WSS worked in good faith to determine whether and how it could satisfy Siemens' revisions to the scope of work, in order to reach a definitive Subcontract. The parties' negotiations over a definitive Subcontract fell through only because of Siemens' bad faith conduct, including but not limited to (1) Siemens' numerous, inconsistent, and unreasonable changes to WSS's scope of work, which were inconsistent with what the parties contemplated when they executed the Term Sheet; (2) Siemens' insistence on working with a third-party supplier (Artemis) that failed to perform adequately; (3) Siemens' refusal to honor its own agreement to assume the risks associated with

Artemis's performance; (4) Siemens' misrepresentation to WSS that it was seeking internal approval to finalize a Subcontract when, upon information and belief, Siemens was actually looking for alternatives outside the teaming arrangement that would enable Siemens to cut corners; and (5) Siemens' bad faith termination of the teaming arrangement.

## COUNTERCLAIMS

### FIRST CLAIM FOR RELIEF
### (Breach of Contract and Anticipatory Repudiation)

44. Defendant re-alleges and incorporates Paragraphs 1-43 herein.

45. Defendant disputes that the March 6, 2018 Term Sheet imposed binding performance obligations on any party. In the event the Court rules that the Term Sheet did impose any binding obligations, however, Plaintiff should be found liable for breaching and repudiating its obligations under the contract. If the Term Sheet did impose any obligation on any party, it was only the obligation to negotiate in good faith regarding a future Subcontract.

46. Assuming the Term Sheet did impose such obligations, Siemens breached the Term Sheet by failing to negotiate in good faith regarding a future Subcontract, and by terminating the teaming arrangement in bad faith. Among other things, Siemens repeatedly made changes to the scope of work in a manner inconsistent with what the parties contemplated when they signed the Term Sheet, dramatically increasing WSS's costs and rendering WSS's performance under a future Subcontract impracticable. Further, after Siemens reassured WSS that it was continuing to negotiate in good faith, upon which WSS relied, Siemens instead unilaterally terminated the parties' teaming arrangement in bad faith in order to switch to working with a different company with which it had already been engaged in secret discussions while the teaming arrangement and WSS were still ongoing.

47.     Siemens' breach and repudiation of the Term Sheet and the parties' teaming arrangement caused WSS damages in an amount to be proven at trial, including but not limited to all amounts WSS invested in trying to determine how to perform Siemens' constantly shifting scope of work for purposes of negotiating a future Subcontract, exceeding at least $684,053.

## SECOND CLAIM FOR RELIEF
### (Breach of the Covenant of Good Faith and Fair Dealing)

48.     Defendant re-alleges and incorporates Paragraphs 1-47 herein.

49.     Implied in every contract is a duty of good faith and fair dealing.

50.     Plaintiff breached this implied covenant by, *inter alia*, continually imposing additional conditions and demands that made Defendant's performance of the Term Sheet impossible, and that were inconsistent with the parties' expectations at the time they executed the Term Sheet.

51.     Plaintiff further breached this implied covenant by negotiating the ESA and MSA in bad faith and failing to inform WSS that Siemens intended to find a new integrator to replace WSS, even while Siemens knew that WSS continued to invest resources on the project in reliance on Siemens' assurances that the teaming arrangement would move forward.

52.     Siemens' breach of the duty of good faith and fair dealing caused WSS damages in an amount to be proven at trial, including but not limited to all amounts WSS invested in trying to determine how to perform Siemens' constantly shifting scope of work for purposes of negotiating a future Subcontract, exceeding at least $684,053.

## PRAYER FOR RELIEF

WHEREFORE, having answered Plaintiff's Complaint, Defendant demands the following relief:

A.     Dismissal of Plaintiff's Complaint with prejudice;

B.    An award of money damages in an amount to be determined at trial;

C.    An award of Defendant's reasonable attorney's fees and costs; and

D.    Such other relief as the Court may deem just and proper.

Dated: July 31, 2024                              **MORGAN, LEWIS & BOCKIUS LLP**

By  *s/ Damon C. Elder*
Damon C. Elder, OSB No. 085313
1301 Second Avenue, Suite 3000
Seattle, WA 98101-3808
(206) 274-6400 | Phone
Email: damon.elder@morganlewis.com

Troy S. Brown (*Admitted Pro Hac Vice*)
Email: troy.brown@morganlewis.com
2222 Market Street
Philadelphia, PA 19103-3007
(215) 963-5214 | Phone

**MULLINS LAW OFFICE, LLC**

Scott L. Mullins, OSB No. 142504
1000 SW Broadway St., Suite 2300
Portland, Oregon 97205
(971) 383-1315 | Phone
scott@slmullins.com

*Attorneys for Defendant WS Acquisition, LLC*