**EDWARD A. PIPER**, OSB No. 141609
ed@angelilaw.com
ANGELI LAW GROUP LLC
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

**GEORGE D. RUTTINGER**, *pro hac vice*
gruttinger@crowell.com
**ANUJ VOHRA**, *pro hac vice*
avohra@crowell.com
**WILLIAM B. O'REILLY**, *pro hac vice*
woreilly@crowell.com
CROWELL & MORING LLP
1001 Pennsylvania Ave. NW
Washington, D.C. 20004
Telephone: (202) 624-2500
Facsimile: (202) 628-5116

**MOLLY A. JONES**, *pro hac vice*
mojones@crowell.com
CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, CA 94111
Telephone: (415) 986-2800
Facsimile: (415) 986-2827

Attorneys for Plaintiff Siemens Medical Solutions USA, Inc.

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| SIEMENS MEDICAL SOLUTIONS USA, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>WS ACQUISITION, LLC dba WESTERN SHELTER SYSTEMS, an Oregon limited liability company<br><br>Defendant. | Case No. 6:23-cv-01882-MC<br><br>**FIRST AMENDED COMPLAINT**<br><br>(Breach of Contract; Breach of the Implied Covenant of Good Faith and Fair Dealing; Fraud)<br><br>DEMAND FOR JURY TRIAL |

PAGE 1 – FIRST AMENDED COMPLAINT

Plaintiff and Counterclaim Defendant Siemens Medical Solutions USA, Inc. ("Siemens Healthineers") brings this action against Defendant and Counterclaim Plaintiff WS Acquisitions, LLC dba Western Shelter Systems ("WSS").  Siemens Healthineers alleges as follows:

**INTRODUCTION**

1.    On December 14, 2017, the United States of Department of Defense ("DOD") initiated a process to solicit bids from medical imaging manufacturers for a contract to supply the government with up to forty-five (45) computed tomography scanners ("CT scanners") mounted in containers that would enable the U.S. Army, Navy, and Air Force to deploy these medical imaging devices in a variety of clinical and environmental conditions.  Upon award of the contract, the DOD issued a press release explaining its purpose was to secure the delivery of state-of-the-art deployable CT scanners for use in austere environments, ensuring DOD personnel receive the best possible care should harm befall them on the battlefield.[1]

2.    The CT scanner uses computer-processed combinations of several x-ray images taken from a variety of angles to produce cross-sectional images focusing on specific areas of the scanned patient. In deployed settings, this technology improves a surgeon's ability to diagnose trauma patients non-invasively in field hospitals—particularly for injuries to the head, abdomen, spine and eye.  As the DOD has noted, the contract for deployable CT scanners is critical to the readiness of the Warfighter and the DOD's medical units.  As a part of the joint service contract, the U.S. Army, Navy, and Air Force worked together to standardize their respective requirements for CT scanners in the deployed setting.

---

[1]    *See* USAMMDA - US Army Awarded Contract for Joint Deployable Computerized Scanner (health.mil) (last visited December 8, 2023).

PAGE 2 – FIRST AMENDED COMPLAINT

3.      After a competitive selection process, in May 2019, DOD's Defense Logistics Agency ("DLA") awarded the deployable CT contract valued over $40 million to Siemens Healthineers for its SOMATOM go.Top Deployable CT.

4.      This case involves WSS' fraudulent inducement of Siemens Healthineers to select WSS as its system integrator for the Deployable CT project and subsequent failure to comply with the terms of multiple agreements with Siemens Healthineers related thereto.

5.      Per the terms of the Siemens Healthineers-WSS agreements, WSS was to serve as Siemens Healthineers' system integrator.  That is, WSS would be responsible for integrating Siemens Healthineers' CT devices into mobilized shipping container units ("shelters")—either newly manufactured or refurbished by WSS—as well as performing any related engineering work.

6.      Unbeknownst to Siemens Healthineers at the time the parties were negotiating these agreements, however, WSS lacked the experience and expertise necessary to understand the effort it was undertaking, much less successfully complete the project. Despite WSS' repeated assurances to the contrary, it was wholly unqualified to provide the system integration services required for Siemens Healthineers' performance of its obligations to DLA. Motivated by the size of the project and revenue guarantees over the ten-year project term, WSS misrepresented its capabilities to Siemens Healthineers, to Siemens Healthineers' detriment.

7.      As a result of WSS' manifest unfitness for the work, WSS' performance failures began almost immediately after DLA's contract award to Siemens Healthineers.  In September 2019—just four months after DLA's award—WSS informed Siemens Healthineers it would be unable to provide an integrated shelter to Siemens Healthineers to deliver to DLA for First

Article Testing ("FAT").  Siemens Healthineers incurred significant costs negotiating a new schedule with DLA as a result of that failure.

8.      By late December 2019, WSS had stopped all required integration work.

9.      DLA has ordered 32 integrated shelters since the May 2019 Contract award (Siemens Healthineers has delivered 24 thus far).  WSS failed to provide integration services for a single one.

10.     As a result of WSS' fraudulent inducement and subsequent performance failures, Siemens Healthineers has suffered damages in myriad forms, including but not limited to delay costs owed to DLA, additional unit-pricing costs Siemens Healthineers was forced to incur working with a replacement integrator, in repair costs to the government-issued shelter Siemens Healthineers provided to WSS for FAT, which WSS initially refused to return, and badly damaged. Siemens Healthineers also suffered damage in the form of reputational harm.

11.     All of those costs, which will continue to accrue for the additional 13 containers DLA may still order, are detailed below.  Siemens Healthineers brings this lawsuit to recover all damages it has incurred and will incur as a result of WSS' fraudulent inducement and performance failures, and to recover the reasonable attorneys' fees and costs it incurs in bringing this action.

## THE PARTIES

12.     Siemens Healthineers is a privately held Delaware corporation with headquarters in Chester County, Pennsylvania.  Siemens Healthineers designs, manufactures, and distributes medical equipment including, relevant to this litigation, CT scanning devices.

13.     WSS is a privately held Oregon limited liability company with its headquarters in Lane County, Oregon.  WSS designs and manufactures mobile shelters and field support systems.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction over Siemens Healthineers' claims

based on diversity of citizenship under 28 U.S.C. § 1332.

15.    Venue is proper within this District pursuant to 28 U.S.C. § 1391(b)(1) because

Defendant WSS is an Oregon corporation with its principal place of business in Eugene, Oregon.

## FACTS

**I.    WSS Fraudulently Induces Siemens Healthineers' Agreement to Team to Respond to a Department of Defense Solicitation for Deployed CT Systems**

16.    On December 14, 2017, DLA issued Request for Offer No. DLA-FSDA-RFO-

12142017 for Deployable CT Systems (the "RFO").  Through the RFO, DLA sought a

standardized supplier for Deployable CT Systems from which DLA customers in each Armed

Service Branch could then purchase equipment.  The RFO included an option for the DLA to

purchase up to 45 Deployable CT units from the selected vendor.  Ex. 1, Request for Offers.

17.    Following release of the RFO, Siemens Healthineers and WSS entered into

negotiations regarding a potential partnership in pursuing the RFO opportunity.  On January 24,

2018, the parties executed a Non-Disclosure Agreement ("NDA") governing the exchange of

confidential information as part of such negotiations.

18.    During these negotiations, WSS' employees, including its sales representatives,

the subject-matter expert for WSS' hard-sided container "mobility" business, and its Chief

Executive Officer, repeatedly represented to Siemens Healthineers that WSS was qualified and

capable of performing the integration work necessary to Deployable CT project.  For example, in

response to questions from Siemens Healthineers about its capabilities, WSS' CEO, Michael

Scala, projected confidence in WSS' ability to undertake the engineering and integration work

necessary to complete the project, going so far as to claim that "[i]t is not us who has to prove if

PAGE 5 – FIRST AMENDED COMPLAINT

we're capable, it is you that has to prove you understand the project."   But at the same time

WSS was touting its capabilities to Siemens Healthineers, it was struggling to solve the

engineering challenges that were central to not only the development of Siemens Healthineers'

responsive proposal to the RFO, but to WSS' successful completion of the integration work that

was contemplated by that proposal and the parties' agreements.

19.     In fact, WSS had never successfully performed a project of similar complexity to

the Deployable CT project, nor did WSS have any other basis to believe in its capability to

perform the integration work being proposed by Siemens Healthineers.

20.     In reliance on WSS' misleading representations regarding its capabilities,

Siemens Healthineers executed a Teaming Agreement with WSS on March 1, 2018, under which

Siemens Healthineers was to act as the Team Leader and would submit a proposal for the prime

contract to be awarded by DLA.  If and when Siemens Healthineers received a prime contract,

the Teaming Agreement contemplated that Siemens Healthineers would issue purchase orders to

WSS subject to terms and conditions of a separate subcontract between the Parties, the key terms

of which would be negotiated concurrently with the preparation of the Parties' response to the

RFO.  Ex. 2, Teaming Agreement.

21.     These agreed-upon key terms were executed via a Term Sheet on March 6, 2018,

with, payment, technical, and delivery terms, including the following binding price term:

"Integrator will be paid the per-Unit fixed prices for the Integrator Project Deliverables supplied

to DLA pursuant to the RFO and set forth in Exhibit B."  Exhibit B, in turn, provided that

Siemens Healthineers would pay WSS a per-unit price of $166,869.13 for each integration (the

"Integration Price"), as well as an additional per-unit price of $177,635.84 in instances where

WSS would be furnishing a newly-fabricated (as opposed to refurbished) shelter (the "Three in

PAGE 6 – FIRST AMENDED COMPLAINT

one Container Price"), each subject to annual escalation.  The term sheet also confirmed WSS'

commitment to provide up to the full 45 Deployable CT units contemplated by the RFO by

prescribing payment terms "for any Project Deliverable Units 1-45[.]"  Ex. 3, Term Sheet.  Once

again, Siemens Healthineers' agreement to this Term Sheet was made in reliance on WSS'

misleading representations regarding its ability to successfully perform the contemplated

integration work, and omissions about its lack of relevant experience.

   22. On May 24, 2018, WSS signed Addendum #1 to the Term Sheet.  In relevant part,

Addendum #1 increased the Integration Price to $175,614.13 (subject to annual escalation).

Addendum #1 also confirmed that this unit pricing would be inclusive of surface transportation

and insurance to the destination selected by DLA for delivery.  Ex. 4, Addendum #1 to Term

Sheet.

   23. Siemens Healthineers submitted a proposal in response to the RFO to DLA on

March 12, 2018.

   24. On April 1, 2019, during the selection process, DLA issued a negotiation letter to

Siemens Healthineers seeking a reduction from the prices Siemens Healthineers had proposed.

In response, Siemens Healthineers requested a price reduction from WSS, and WSS agreed to a

revised pricing worksheet to replace the pricing in Addendum #1.  This worksheet reduced the

Integration Price and the Three in one Container Price to $172,101.85 and $174,971.30,

respectively, and also reflected pricing for a "Power distribution package" at $24,084.48 (all

subject to annual escalation).  Ex. 5, Multiyear Pricing Worksheet.

PAGE 7 – FIRST AMENDED COMPLAINT

**II.    DLA Awards the Contract to Siemens Healthineers; Siemens Healthineers Issues Multiple Purchase Orders to WSS for Container Integration**

25.     On May 6, 2019, DLA selected Siemens Healthineers as its Deployable CT vendor and issued Delivery Order No. SPE2D1-19-F-0303 to Siemens Healthineers for production of a unit for FAT utilizing a government-supplied shelter.  This delivery order required delivery within 120 days of receipt of the government-supplied shelter.  The shelter to be used for FAT was delivered to WSS on May 24, 2019, resulting in a delivery deadline of September 25, 2019.

26.     On June 13, 2019, Siemens Healthineers issued Purchase Order No. 5333478 to WSS with a total order value of $366,892.37 ("Purchase Order").  Consistent with the pricing previously agreed upon by the Parties, this order value included $171,428.57 for non-recurring engineering costs of integration, $172,101.85 for integration of Siemens Healthineers' CT scanner into the shelter, and $23,361.95 for power distribution.   The Purchase Order contained the following language:

> **This Siemens Medical Solutions USA, Inc. Purchase Order, for the products and services described herein at the stated prices and terms, is subject to your acceptance of the terms and conditions, located at: http://www.usa.siemens.com/SupplierStandards. Supplier must provide immediate notification in writing to Siemens of any part changes to the product, service, or internal process for any item covered by this Purchase Order.**

Ex. 6, Purchase Order No. 533478.

27.     The above-referenced terms and conditions provided that the Parties' rights and obligations would be governed by Pennsylvania law, and that Siemens Healthineers would be entitled to reasonable attorneys' fees in the event it was necessary to bring suit to enforce performance of any provision of the agreement of the which the terms and conditions were part.

PAGE 8 – FIRST AMENDED COMPLAINT

Ex. 7, Siemens Medical Solutions USA, Inc. Terms and Conditions for Purchase of Goods and/or Services.

28.    At no point did WSS object, take exception, or otherwise attempt to negotiate the terms of the Purchase Order, including any provisions of Siemens Healthineers' standard terms and conditions referenced therein.

**III.    WSS Fails to Fulfill its Obligations Under the Purchase Orders, Requiring Siemens Healthineers to Make Multiple Concessions to DLA in Exchange for Schedule Adjustments**

29.    On June 12, 2019, WSS provided Siemens Healthineers with a project plan timeline estimating that it would not complete its work on the government-furnished shelter to be submitted for FAT until October 14, 2019.  (Siemens Healthineers expected WSS to have this work completed by September 1, 2019.)  Because WSS' project plan already missed the September 25, 2019 delivery date required by DLA, and did not include certain operations required to be performed by Siemens Healthineers prior to delivery, Siemens Healthineers was forced to negotiate with DLA for a schedule extension of First Article delivery to November 25, 2019.

30.    Siemens Healthineers received additional delivery orders from DLA on July 15, August 1, and August 12, 2019, for a total of six units, inclusive of the First Article.  Siemens Healthineers subsequently issued additional purchase orders to WSS on August 20 and August 22, 2019, for a total of five units, inclusive of the First Article.  (In light of WSS' deteriorating performance discussed below, Siemens Healthineers chose to delay issuing a purchase order for the sixth unit.)  Each subsequent purchase order was subject to the same terms and conditions referenced above.  Ex. 8, Additional WSS Purchase Orders.

31.    Throughout the fall of 2019, WSS repeatedly failed to meet scheduled delivery deadlines, requiring Siemens Healthineers to negotiate additional extensions with DLA for both

the FAT unit and subsequently-ordered units, the delivery of which was contingent upon

Siemens Healthineers passing FAT.

32.    As consideration for the various schedule extensions necessitated by WSS' delays

in performance, Siemens Healthineers ultimately provided DLA and its customers trainings,

extended warranties, and other concessions valued at approximately $344,410.

**IV.    WSS Repudiates its Obligations Under the Term Sheet and Purchase Orders; Siemens Healthineers Terminates WSS for Default**

33.    While WSS was ostensibly working on the unit to be submitted for FAT, the

Parties were also engaged in negotiations over a definitive subcontract.

34.    On May 17, 2019, Siemens Healthineers sent WSS a draft Manufacturing

Services Agreement ("MSA"), to which the Parties exchanged proposed revisions and additions

over the following months.

35.    On October 16, 2019, during a meeting between Party representatives, WSS for

the first time requested a separate agreement to cover the scope of the design and engineering

work.  WSS did not, however, attempt to revisit the fixed price of $171,428.57 the Parties had

previously agreed to for these services.

36.    At this same meeting, WSS asserted that it would not work directly with Artemis

Shielding ("Artemis"), a supplier of radiation shielding materials included in Siemens

Healthineers' proposal to DLA.  WSS did so despite having previously acknowledged that its

fixed-unit pricing was inclusive of such shielding materials.  As a result, Siemens Healthineers

was forced to negotiate its own separate supplier agreement with Artemis, incurring shielding

costs that should have been borne by WSS.

37.    As for its request for a separate agreement with Siemens Healthineers to cover

design and engineering work, WSS never provided a proposal for such an agreement.

Accordingly, on October 31, 2019, Siemens Healthineers provided a draft Engineering Services Agreement ("ESA") to WSS' counsel.

38.     On December 6, 2019, following additional back-and-forth between the parties, WSS indicated that if the parties had not executed an MSA and ESA by December 13, 2019, it would cease all integration work required by Siemens Healthineers' Purchase Orders.

39.     Siemens Healthineers responded to WSS' ultimatum by expressing concern about the potential adverse impacts of a work stoppage on both Siemens Healthineers' contract with DLA, as well as the Parties' ability to successfully negotiate the outstanding agreements. Siemens Healthineers also explained that WSS had delayed subcontract negotiations by failing to provide comments or revisions on the ESA in a timely manner.

40.     Also on December 6, 2019—one week prior to its self-imposed deadline to execute both agreements—WSS provided proposed revisions to the ESA that included increased non-recurring engineering ("NRE") costs that now totaled nearly $900,000, as opposed to the $171,428.57 agreed to in the Term Sheet.

41.     After Siemens Healthineers attempted to negotiate on WSS' additional proposed NRE costs, WSS, via counsel, represented that "what has been proposed in terms of economics is being rejected in full." Though its position directly contravened the Term Sheet to which the Parties had originally agreed, WSS stated it would engage in no further negotiations until the basic economics of the agreement were revised.

42.     On January 9, 2020, counsel for WSS confirmed that WSS had stopped all integration work required under the purchase orders Siemens Healthineers had previously issued as of December 18, 2019.

PAGE 11 – FIRST AMENDED COMPLAINT

43.     On March 2, 2020, Siemens Healthineers notified WSS via letter that it was

terminated for default pursuant to the terms of the Purchase Order.

**V.     WSS Refuses to Return the Government-Issued Shelter to Siemens Healthineers Following the Default Termination**

44.     Upon terminating WSS for default, Siemens Healthineers requested that WSS

return the government-furnished shelter being prepared for FAT.  Despite the shelter being the

undisputed property of the United States government, WSS rebuffed two attempts by Siemens

Healthineers to recover it, demanding Siemens Healthineers first pay $684,053, representing

costs allegedly incurred by WSS on the project to date.  Only after counsel for Siemens

Healthineers, by letter dated March 31, 2020, explained that the improper withholding of

government property may constitute a violation of federal criminal law, did WSS relent.  As a

result of WSS' intransigence, Siemens Healthineers incurred approximately $31,724 in costs for

recovery of the shelter.

45.     Due to the delay in recovering the shelter, DLA delivered a second shelter for the

First Article to Siemens Healthineers' replacement subcontractor.  Upon recovery of the original

shelter from WSS, Siemens Healthineers arranged for its return to the government, which

determined that remediation for damage inflicted was necessary, resulting in an estimated

additional $50,600 in costs to Siemens Healthineers.

**VI.     Siemens Healthineers is Forced to Engage a Replacement Contractor for WSS' Integration Work at Significantly Increased Cost**

46.     As a result of WSS' default, Siemens Healthineers was forced to find a

replacement subcontractor to perform WSS' integration work to ensure Siemens Healthineers

complied with its own obligations under its contract with DLA.

47.     Accordingly, on February 21, 2020, Siemens Healthineers executed an agreement

with Gichner Systems Group, Inc. ("Gichner") to serve as Siemens Healthineers' replacement for

WSS. Gichner required Siemens Healthineers to place an initial order of ten units (despite DLA only having ordered six to that point) before Gichner would agree to serve as Siemens Healthineers' integrator. Gichner subsequently required Siemens Healthineers to commit to another bulk purchase of 15 units. Siemens Healthineers, facing a potential default on its contract with DLA, had no choice but to do so.

48.    Gichner charged Siemens Healthineers $223,618.00 for integration of the FAT unit using the government-provided shelter. For units 1-10 following the FAT unit, Gichner required Siemens Healthineers to agree to a per-unit price (including the required integration services, the cost of a new shelter, and power distribution) of $614,597, an increase of more than $200,000 as compared to WSS' per-unit price. For units 11-26, Gichner required Siemens Healthineers to agree to a per-unit price of $616,354. Moreover, Gichner required Siemens Healthineers to place an initial order of ten units (despite DLA only having ordered six to that point) before Gichner would agree to serve as Siemens Healthineers' integrator. Siemens Healthineers, facing a potential default on its contract with DLA, had no choice but to do so.

49.    Despite Gichner's higher per-unit costs, the scope of Gichner's services was nevertheless narrower than WSS', and did not include the costs for shielding materials supplied by Artemis or transportation costs for the completed units, costs that were originally included in WSS' per-unit pricing.

50.    To date, Siemens Healthineers has spent approximately $450,000 for Artemis shielding materials and $100,000 for transportation and delivery of the completed units.

51.    On November 20, 2021, the U.S. Air Force notified DLA of its acceptance of a first delivery unit; DLA subsequently authorized Siemens Healthineers to begin delivery of all previously and subsequently ordered units.

PAGE 13 – FIRST AMENDED COMPLAINT

52.     To date, DLA has ordered 32 units in total, inclusive of the FAT unit.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Default and Breach of Contract)

53.     Siemens Healthineers repeats and incorporates by reference, as if fully set forth herein, the allegations in all preceding paragraphs.

54.     Pursuant to the March 6, 2018 Term Sheet, as amended, WSS contracted to provide integrated shelters to Siemens Healthineers at a fixed price if included in a purchase order issued by DLA.

55.     WSS accepted each purchase order issued by Siemens Healthineers by performing thereunder, including the terms and conditions incorporated therein by reference.

56.     Pursuant to these terms and conditions, WSS is liable to Siemens Healthineers for any excess cost incurred by Siemens Healthineers to secure the manufacture and delivery of substitute goods in the event of default by WSS.

57.     For purposes of the foregoing, default includes, but is not limited to, WSS' failure to deliver completed goods within the time specified.

58.     By repudiating its obligations under the Term Sheet and each of the purchase orders, WSS defaulted in its obligations to timely deliver the required goods.  Siemens Healthineers is therefore entitled to its excess costs in an amount to be proven at trial, including, but not limited to:

        a.   $7.8 million in excess reprocurement costs paid to Gichner for the 34 deployable CT units ordered by Siemens Healthineers, of which 32 have been ordered by DLA and 26 have been delivered by Siemens Healthineers, to date;

        b.   $540,000 in costs paid to Artemis Shielding to date;

PAGE 14 – FIRST AMENDED COMPLAINT

c.  $350,000 in consideration provided to DLA for schedule adjustments resulting from WSS' inability to meet the originally required date for FAT;

d.  $100,000 in transportation costs for delivery of completed Deployable CT systems to DLA and its customers to date;

e.  $55,600 in costs to remediate the DLA-provided shelter; and

f.  Up to $3 million in additional excess reprocurement costs Siemens Healthineers will incur to deliver the remaining 13 units DLA may still order under the terms of the RFO.

## SECOND CLAIM FOR RELIEF
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

59.    Siemens Healthineers repeats and incorporated by reference, as if fully set forth herein, the allegations in all preceding paragraphs.

60.    Every contract imposes upon each party an implied covenant, or duty, of good faith and fair dealing in its performance and enforcement, and accordingly, there is an implied covenant in the parties' agreements that WSS shall not do anything which will have the effect of destroying or injuring the right of Siemens Healthineers to receive the benefits owed to it under the contract.

61.    Siemens Healthineers reasonably expected that WSS would negotiate in good faith with Siemens Healthineers to reach agreement on a definitive subcontract, that WSS would complete the FAT unit and deliver other units under the Siemens Healthineers Purchase Orders, and otherwise that WSS would perform its obligations under the parties' agreements so as not to deprive Siemens Healthineers of the bargained-for benefits thereunder. WSS further had a duty of good faith and fair dealing so as to effectuate the reasonable contractual expectations of Siemens Healthineers.

62.    WSS breached the implied covenant of good faith and fair dealing by failing to honor its pricing obligations and deliver fully integrated Deployable CT units, including the FAT

unit. WSS further breached the implied covenant by inducing Siemens Healthineers to continue to perform under the Term Sheet and Purchase Orders while misleading Siemens Healthineers as to WSS' lack of experience throughout its performance of its obligations under the parties' agreements. WSS further breached the duty of good faith and fair dealing by failing to diligently respond to Siemens Healthineers' various proposed terms and conditions for a definitive subcontract, actions informed in part by WSS' lack of expertise in the integration work required by the Deployable CT Project.

63.    WSS further breached that duty by demanding in bad faith that Siemens Healthineers revisit the binding price, payment, and delivery terms of the Term Sheet.

64.    Siemens Healthineers was harmed by WSS' breaches of its duty of good faith and fair dealing, and is therefore entitled to its damages in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF
### (Fraudulent Inducement)

65.    Siemens Healthineers repeats and incorporates by reference, as if fully set forth herein, the allegations in all preceding paragraphs.

66.    WSS, in negotiation the Teaming Agreement and Term Sheet, falsely represented that it had experience with and was otherwise qualified to perform integration services with equipment of the type/complexity required for the Deployable CT project.

67.    At the time WSS made those representation, WSS knew or should have known of the falsity of its representations.

68.    WSS' false representations regarding its experience and capabilities were made for the purpose of misleading Siemens Healthineers into selecting WSS as the system integrator for the Deployable CT project.

69.     WSS never acknowledged its lack of experience or inability to perform the requirements necessary for the Deployable CT project and denied any lack of experience or qualification in response to questions raised by Siemens Healthineers representatives.  Moreover, WSS employees who raised concerns about the company's ability to perform the work required under the Deployable CT project were removed from, or frozen out of, the project.

70.     Siemens Healthineers justifiably relied on WSS' false representations of its experience and capabilities.

71.     Siemens Healthineers would not have selected WSS as its system integrator for the Deployable CT project but for WSS' false representations of its experience and capabilities, which were therefore material to Siemens Healthineers' agreement to the Teaming Agreement and Term Sheet.

72.     Siemens Healthineers was harmed by WSS' false representations its experience and capabilities.  Siemens Healthineers is therefore entitled to its damages in an amount to be proven at trial.

## JURY DEMAND

73.     Siemens Healthineers hereby demands a trial by jury as to all issues so triable in this action.

## PRAYER

WHEREFORE, Siemens Healthineers prays for relief as follows:

1.     An award of damages, including but not limited to economic, statutory, and punitive damages, as permitted by law and in amounts to be proven at trial;

2.     The reasonable attorneys' fees and costs that Siemens Healthineers incurs in bringing this action;

3.     Pre- and post-judgment interest as allowed by law; and

PAGE 17 – FIRST AMENDED COMPLAINT

4.      Such other relief as the Court may deem just and proper.


DATED this 16th day of December, 2024

**CROWELL & MORING LLP**

By: *s/ Anuj Vohra*
Anuj Vohra (*Pro Hac Vice*)
George David Ruttinger (*Pro Hac Vice*)
William Benjamin O'Reilly (*Pro Hac Vice*)
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Email: avohra@crowell.com
        gruttinger@crowell.com
        woreilly@crowell.com

Molly A. Jones (*Pro Hac Vice*)
3 Embarcadero Center, 26th Floor
San Francisco, CA 94111
Email: mojones@crowell.com

**ANGELI LAW GROUP LLC**

By: *s/ Ed Piper*
Edward A. Piper, OSB No. 020244
121 SW Morrison St., Suite 400
Portland, OR 97204
Email: ed@angelilaw.com

*Attorneys for Plaintiff Siemens Medical
Solutions USA, Inc.*

PAGE 18 – FIRST AMENDED COMPLAINT